RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0129p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOSEPH BAILEY,

      *Plaintiff-Appellee,*

  *v.*

CITY OF ANN ARBOR; CHRISTOPHER FITZPATRICK,
WILLIAM STANFORD, and MICHAEL DORTCH, in their
individual and official capacities,

      *Defendants-Appellants.*

No. 16-2478

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 4:14-cv-12002—Linda V. Parker, District Judge.

Decided and Filed:  June 20, 2017

Before:  KEITH, BATCHELDER, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Thomas L. Kent, CITY OF ANN ARBOR, Ann Arbor, Michigan, for Appellants.
Shawn C. Cabot, CHRISTOPHER TRAINOR & ASSOCIATES, White Lake, Michigan, for
Appellee.

_____

## OPINION

_____

  SUTTON, Circuit Judge.  In this qualified immunity case, Ann Arbor police officers
relied on a security camera's footage of a robbery, allegedly without accounting for inconsistent
eyewitness testimony, in drafting a search warrant for Joseph Bailey's residence.  Yet the
warrant did not say whether the description of Bailey came from the robbery victim or just the

video and indeed mentioned both sources of information. The description thus was not deliberately false, and the district court erred in holding that it was. A review of the video also confirms that there were few disparities between the video and the description in the warrant. Even if we strip the warrant of any possible falsities, a fair probability remained that the officers would find evidence of the robbery in Bailey's home, meaning his Fourth Amendment claim under § 1983 fails as a matter of law. And because the warrant was the sole evidence of underlying unconstitutional conduct by Ann Arbor employees, his *Monell* claim fails as well.

I.

On the evening of April 9, 2012, two men wearing masks robbed the Broadway Party Store in Ann Arbor, Michigan. The security video shows that one masked man pointed a shotgun at the store clerk. As the video shows, and as readers can see for themselves, Ann Arbor News, *Gunpoint Robbery at Ann Arbor Party Store* (Apr. 19, 2012), https://www.youtube.com/watch?v=ePP9fd0ckok, the gunman wore a black sweatshirt with a white skeleton pattern that zipped up to form a skull hood, along with a dark vest and blue jeans. The gunman's exposed hands appeared black to the store clerk and on the video. The gunman's accomplice took cash from the register and several bottles of champagne. The masked men fled half a minute after entering the store.

The Ann Arbor Police Department investigated the robbery. About six weeks later, Detectives Christopher Fitzpatrick and William Stanford visited the house of Joseph Bailey's mother. She said her son wasn't home and showed the detectives his bedroom to prove it. The detectives saw a skeleton hoodie hanging on the bedroom door. Stanford prepared an affidavit for a search warrant later that day that noted that the gunman was "wearing a skeleton sweat shirt mask with the hood zipped in the front as a skull" and that the detectives had seen a similar sweatshirt in Bailey's room. The search warrant added that Stanford had received a tip from an unknown caller who said that Bailey, an African-American, had committed the robbery. A judge approved the search warrant for clothes, identifying documents, and money in the house, and the detectives seized the skeleton sweatshirt and other clothes.

Later that day, Fitzpatrick and Stanford approached Bailey and arrested him after he fled from them into a wooded area.  A grand jury indicted Bailey for armed robbery, possession of a short-barreled shotgun, and resisting arrest.  The prosecutor dropped the first two charges, and Bailey pleaded guilty to the resistance charge.

Bailey sued the City of Ann Arbor, Fitzpatrick, Stanford, and Detective Michael Dortch, the officer in charge of the investigation, under 42 U.S.C. § 1983, claiming they violated his Fourth Amendment rights.  He claimed that the store clerk told Dortch that the gunman "was five feet/ten inches tall; was wearing a white mask (not a hoodie) that covered the entire head with insect-type/Spiderman eyes; was wearing a white coat; and did not know what type of pants or shoes were worn."  R. 22 at 4.  He claimed that the YouTube video of the robbery supported the store clerk's description of the suspect rather than the description of the gunman provided in the search warrant affidavit.  And he claimed that Stanford never received an anonymous tip.

The defendants moved to dismiss the complaint.  Relying on a magistrate judge's recommendation, the district court denied the detectives' motion to dismiss the search and seizure claim and the malicious prosecution claim based on the purported falsehoods in the search warrant affidavit.  For similar reasons, the court did the same with respect to the City's motion to dismiss the *Monell* claim.

II.

We have jurisdiction over (1) the detectives' interlocutory appeal because it arises from the denial of a motion to dismiss based on qualified immunity, *Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985), and (2) the City's appeal because it is inextricably intertwined with the detectives' appeal, *Courtright v. City of Battle Creek*, 839 F.3d 513, 523 (6th Cir. 2016).  We construe the complaint in the light most favorable to Bailey, accept his allegations as true, and draw all reasonable inferences in his favor.  *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 562 (6th Cir. 2013) (en banc).  We give fresh review to the court's legal rulings. *Id.*

*Search and seizure claim.*  Qualified immunity shields the detectives from liability in this § 1983 constitutional tort action if (1) they did not violate any constitutional guarantees or (2) the

guarantee, even if violated, was not clearly established at the time of the alleged misconduct. *Arrington-Bey v. City of Bedford Heights*, __ F.3d __, No. 16-3317, 2017 WL 2432389, at *3 (6th Cir. Feb. 24, 2017). This claim fails at the first step.

Police officers normally receive qualified immunity if they rely on a judicially secured warrant. *Hale v. Kart*, 396 F.3d 721, 725 (6th Cir. 2005). But officers violate the Fourth Amendment if they make "a false statement knowingly and intentionally, or with reckless disregard for the truth" in the warrant affidavit "if the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). The same goes for omissions if the plaintiff makes "a strong preliminary showing that the affiant intended to mislead the judge by omitting information from the affidavit." *Hale*, 396 F.3d at 726–27.

Bailey has not plausibly alleged that the detectives intentionally deceived the judge about any fact necessary to the probable cause determination. Here is how Stanford's affidavit described the gunman:

> D. The victim in this robbery was identified as Sang-Chul Choi. He told officer McNally that two men wearing masks entered his store and were holding a shot gun. The men demanded money and held Mr. Choi at gun point. The men took the money from the register which was approximately $1000.00 and three bottles of champagne.
> E. Mr. Choi said the man with the shot gun was a Black Male in his late teens or early twenty's. He was about 5[']6["] tall and wearing a skeleton sweat shirt mask with the hood zipped in the front as a skull. The suspect's hands were exposed and he did not have gloves on. The suspect was wearing blue jeans with a symbol on the upper right thigh. The suspect was also wearing a sleeveless jacket over the skeleton sweat shirt with a symbol on the upper front left side.
> F. Detective Fitzpatrick obtained a copy of the security video on 04/14/12 of the robbery and placed the video in Ann Arbor.com and local TV media.

R. 22-1 at 2. Earlier in the affidavit, Stanford described the sweatshirt as a "Black and White skeleton sweat shirt with hood that zips up in the front and becomes a skull." *Id.* And later in the affidavit, Stanford likewise described the "black and white skeleton sweat shirt with a s[k]ull hood[] that zips in the front" that Fitzpatrick and he saw in Bailey's room. *Id.* at 3.

In assessing this description, may we measure its accuracy with reference to the transcript of the state court preliminary examination of Bailey or the store video? No to the first. Yes to the second.

As for the transcript, a court ruling on a motion to dismiss "*may* consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice." *New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) (emphasis added). But the district court had a good reason not to consider this transcript, public though it was and even though the detectives wanted to use it. The preliminary examination took place on June 7, 2012, nearly two weeks after the detectives obtained the search warrant. The preliminary examination thus sheds light on the decision to hold Bailey over for trial but little light on the much earlier warrant decision.

A different conclusion applies to the video. Bailey mentioned it throughout his complaint, and the defendants asked the court to consider the video when they objected to the magistrate's report. A central aspect of Bailey's claims was that the detectives ignored clear evidence in the security video that the gunman did not look like Bailey and was not wearing a black skeleton hoodie, as the affidavit claimed. This is not a case where the video captured only part of the incident or would distort our view of the events. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). It covers the whole thing. From the first frame to the last, the video contradicts how Bailey describes it and contradicts what Bailey claims the victim told Dortch. In contrast to other cases, *see, e.g.*, *Thomas v. Noder-Love*, 621 F. App'x 825, 830 (6th Cir. 2015), no reasonable jury could watch the video and agree with Bailey that the gunman was wearing a white coat instead of a black and white skeleton sweatshirt. The video "utterly discredit[s]" Bailey's version of events and allows us to ignore the "visible fiction" in his complaint. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

That remains so even at the motion to dismiss stage. If Bailey's pleadings internally contradict verifiable facts central to his claims, that makes his allegations implausible. *See Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017). That's why our sister courts have considered videos when granting motions to dismiss. *See, e.g.*, *Garcia v. Does*, 779 F.3d 84, 87–88, 97 (2d Cir. 2015); *Hartman v. Walker*, __ F. App'x __, 2017 WL 1380608, at *2 (5th Cir. Apr. 18,

2017); *Bogie v. Rosenberg*, 705 F.3d 603, 608–09, 611–12 (7th Cir. 2013). And that's why we do so here.

No reasonable person who has viewed the video could say that it is deliberately false to describe the gunman as wearing a black and white skeleton sweatshirt with a hood that looked like a skull. Nor is it plausible to describe the gunman as wearing a white coat, as Bailey described the gunman in his complaint. That's just not what it shows.

The rest of the gunman's attire is consistent with how Stanford described it in his affidavit. True to its word, the affidavit describes the gunman as wearing some sort of "[d]ark colored vest" or "sleeveless jacket over the skeleton sweat shirt with a symbol on the upper front left side." R. 22-1 at 2. Definitely not a white coat. One might describe the gunman's facial covering as a white mask with "insect-type/Spiderman eyes." R. 22 at 4. But it makes more sense to describe the mask, as Stanford did, as a "hood zipped in the front as a skull," R. 22-1 at 2, when we see the black zipper running up the middle of the mask from the skeleton sweatshirt. And we can see the blue jeans with some symbol or design on the upper right thigh in the video when the gunman walked out of the store. Although Bailey emphasizes that the victim wasn't absolutely certain that the gunman was black, the complaint acknowledges that the victim thought the gunman was black based on the color of his exposed hands. No one disputes that gunman did not wear gloves. In the end, virtually all of Stanford's description of the gunman was not false at all. Indeed, it was quite accurate. Only one potential disparity exists, and it is hard to prove either way: The affidavit describes the gunman as five foot six inches, while the witness said he was four inches taller. It is not clear that is false. But it most assuredly is not deliberately false.

What is more, even if we delete the parts of the affidavit that Bailey plausibly challenges—the gunman's height and the anonymous tip—probable cause still exists to grant a search warrant. "All that's needed for probable cause is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Brown*, 857 F.3d 334, 339 (6th Cir. 2017) (quotation omitted). The detectives had already seen a black and white skeleton sweatshirt similar to the one in the video when Bailey's mother let them into his room, and Stanford said so in the affidavit. This was not a generic sweatshirt with a big maize letter

common to many an Ann Arbor closet. It is a distinctive black and white skeleton sweatshirt that zipped up to form a skull hood. Seeing that distinctive clothing in Bailey's room gave the detectives more than the fair probability needed to secure a search warrant for the house—to seize the sweatshirt and to look for other evidence, perhaps the money or other clothing, connected to the crime. *Cf. United States v. Ruff*, 437 F. App'x 448, 451 (6th Cir. 2011); *United States v. Thomas*, 223 F. App'x 447, 458 (6th Cir. 2007).

The district court instead found the affidavit false and misleading because it left out what the victim allegedly told Dortch and suggested that the victim, not the video, provided the affidavit's description of the gunman. But only two lines in the affidavit say that the information came from the victim: (1) "He told officer McNally that two men wearing masks entered his store and were holding a shot gun," and (2) "Mr. Choi said the man with the shot gun was a Black Male in his late teens or early twenty's." R. 22-1 at 2. Those statements are either consistent with the video, which Stanford referenced immediately after his description of the gunman, or unnecessary to find probable cause. Other facts in the affidavit perhaps might be interpreted to read as though Choi provided them to the officers. But it makes no difference either way because the affidavit acknowledges the surveillance video.

Judging the search warrant affidavit on "the totality of the circumstances," as we must, the affidavit established a strong probability that the detectives would find evidence of the crime in the house. *United States v. Thomas*, 605 F.3d 300, 307, 309 (6th Cir. 2010). Adding the victim's alleged statements to the affidavit would have contributed little when the claimed disparities were visibly false.

Bailey offers no other theory for denying the detectives' motion to dismiss. The "officers' liability," in his words, "depends on whether the search of [his] room and subsequent seizure of his property was executed under a valid warrant." Appellee's Br. 31. Because the search warrant was valid and the affidavit did not contain any knowing falsehoods, we reverse the district court's decision denying the motion to dismiss the unreasonable search and seizure claim.

*Malicious prosecution claim.* Bailey's malicious prosecution claim does not fare any better. Among other requirements of this claim, he must show an absence of probable cause for the prosecution. *See Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). In permitting this claim to continue, the district court rested its decision on the supposedly false affidavit. That's why the defendants mentioned the malicious prosecution claim early in their brief and then focused their brief on whether the affidavit was false or misleading. The detectives did not waive this argument, and its fate is tied to our resolution of the unreasonable search and seizure claim. We thus reverse the district court's decision denying the motion to dismiss for the same reason.

*Monell claim.* The City appeals the district court's denial of its motion to dismiss as well. Under § 1983, we may hold a city liable for a constitutional tort "if the injury is caused by a municipal custom or policy, or if the city's failure to train employees amounts to deliberate indifference to constitutional rights." *Arrington-Bey*, __ F.3d at __, 2017 WL 2432389, at *5; *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 694 (1978). The district court permitted the claim against the City to proceed in view of its ruling about the unconstitutional warrant. Having dispatched that claim, we must dispatch this one as well. Bailey points to no other ground for upholding this claim, meaning our resolution of the one claim resolves the *Monell* claim as well.

One other house-cleaning item. Bailey maintains that, in reviewing a motion to dismiss a *Monell* claim, the plausibility standard of *Twombly* and *Iqbal* does not apply. He insists that the "no set of facts" pleading standard articulated in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), remains good law and applies to this claim. That is wrong. The Supreme Court overruled the *Conley* standard in *Twombly*. 550 U.S. 544, 561–62 (2007). That means district courts may not rely on contrary language in *Petty v. County of Franklin*, 478 F.3d 341, 345 (6th Cir. 2007), which is inconsistent with the Supreme Court's more recent and precedentially superior decisions in *Twombly* and *Iqbal*.

For these reasons, we reverse and remand the case for further proceedings consistent with this opinion.