**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 17a0598n.06

No. 16-2338

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| DANIEL ZAVATSON, | ) | **FILED** |
|  | ) | Oct 31, 2017 |
| **Plaintiff-Appellant,** | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| CITY OF WARREN, MICHIGAN, | ) | COURT FOR THE EASTERN |
| DONALD SEIDL, FITZGERALD PUBLIC | ) | DISTRICT OF MICHIGAN |
| SCHOOLS, FITZGERALD PUBLIC | ) |  |
| SCHOOL BOARD OF EDUCATION, | ) |  |
| BARBARA VANSWEDEN, MELANIE | ) | **OPINION** |
| RAINWATER, WENDY HAGGERTY, | ) |  |
| MARC SONNENFELD, and JOHN | ) |  |
| CANDELA, | ) |  |
|  | ) |  |
| **Defendants-Appellees.** | ) |  |

Before: MOORE, STRANCH, and DONALD, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** This appeal concerns the district court's summary adjudication of Plaintiff-Appellant Daniel Zavatson's false-arrest, malicious-prosecution, failure-to-train, failure-to-supervise, and procedural-due-process claims in favor of Defendants-Appellees City of Warren, Michigan and Donald Seidl (collectively, "Warren Defendants"); and Defendants-Appellees Fitzgerald Public Schools ("FPS"), Fitzgerald Public School Board of Education, Barbara VanSweden, Melanie Rainwater, Wendy Haggerty, Marc Sonnenfeld, and John Candela (collectively, "Fitzgerald Defendants"). FPS and the Warren Defendants investigated Zavatson, a custodian at Fitzgerald High School ("FHS"), in connection

with a cash theft in two FHS offices. Although FPS's investigation was inconclusive, Seidl, a police officer assigned to the case, concluded that Zavatson had stolen the cash. This conclusion led to an arrest warrant for Zavatson. When Zavatson failed to report the charges stemming from his arrest warrant to FHS, he was terminated from his position. Several months after Zavatson was terminated, a Michigan court determined that there was insufficient probable cause to support Zavatson's arrest, and his criminal charges were dismissed. We hold that a reasonable jury could find that probable cause was indeed lacking for Zavatson's arrest and that some of Zavatson's claims may proceed as a result. Specifically, we **REVERSE** the judgment with respect to Zavatson's false-arrest claims against Seidl. We **AFFIRM** the judgment with respect to the federal and state false-arrest claims against Sonnenfeld and Candela; the federal and state malicious-prosecution claims against Seidl, Sonnenfeld, and Candela; the failure-to-train and failure-to-supervise claims against the City of Warren; and the procedural-due-process claim against the Fitzgerald Defendants.

## I. BACKGROUND

The following facts are described in the light most favorable to Zavatson, the nonmoving party. *See Voyticky v. Village of Timberlake*, 412 F.3d 669, 675 (6th Cir. 2005).

### A. Alleged Thefts

On November 27, 2012, after returning to work from the Thanksgiving holiday, Defendant-Appellee Marc Sonnenfeld, the athletic director at FHS in Warren, Michigan, discovered that $510 was missing from a safe in his office. R. 43-2 (Sonnenfeld Dep. Vol. I at

2

16) (Page ID #266); R. 43-3 (Sonnenfeld Dep. Vol. II at 44) (Page ID #299). The safe contained proceeds from school sporting events. R. 43-2 (Sonnenfeld Dep. Vol. I at 41) (Page ID #273). "[P]anic[ked]" that the cash was missing, Sonnenfeld went to the school accounting office to obtain cash for an event that evening. R. 43-4 (Candela Dep. at 29) (Page ID #337). There, he met with Defendant-Appellee John Candela, who "[h]andled the financial reporting for the school district." *Id.* at 8 (Page ID #316). Candela told Sonnenfeld not to worry, and that the accounting office could cover the event. *Id.* at 29 (Page ID #337). However, when Candela unlocked and opened his "petty cash box," he too discovered that cash—$260—was missing. *Id.* at 30 (Page ID #338). Faced with this pattern of missing cash, Sonnenfeld promptly notified the police. R. 43-3 (Sonnenfeld Dep. Vol. II at 26) (Page ID #295). In response to Sonnenfeld's call, the Warren Police Department assigned the case to Officer John Dahlin, a defendant who was dismissed pursuant to a stipulation by the parties, R. 40 (Dahlin Stipulation) (Page ID #216), and Defendant-Appellee Donald Seidl, another officer at the Warren Police Department who had become a detective on October 26, 2012. R. 43-8 (Seidl Dep. at 54) (Page ID #428). A police-academy graduate, Seidl received two weeks of "on-the-job training" regarding "gathering probable cause in order to secure an arrest warrant from the prosecutor." *Id.* at 52–54 (Page ID #427–28). However, he received no formal training on the subject. *Id.* at 52–53.

Before the police arrived, either Sonnenfeld or the school principal asked Gary Skop, who worked security at the school, R. 43-5 (Skop Dep. at 10) (Page ID #365), to review video surveillance for the days leading up to Thanksgiving, *id.* at 17 (Page ID #367). After reviewing

3

the footage, one particular sequence of events stood out to Skop: on November 20, 2012, an individual, whom Skop identified as male, entered Sonnenfeld's office at 10:28 p.m. and left at 10:34 p.m. *Id.* at 34–35 (Page ID #371).

Around this time, other individuals could be seen throughout the school on the surveillance footage. For instance, at 10:10 p.m.—eighteen minutes before the unidentified individual entered Sonnenfeld's office—Zavatson could be seen entering the custodian break room, within which there is no surveillance. *Id.* at 35 (Page ID #371); R. 46-8 (Police Report at 10) (Page ID #1506). Zavatson could be then seen leaving the break room at 10:37 p.m, three minutes after the unidentified individual left Sonnenfeld's office. R. 43-5 (Skop Dep. at 34–35) (Page ID #371). The video also depicted an unidentified individual leaving the back door of the break room and going into the cafeteria between 10:10 p.m. and 10:37 p.m. *Id.* at 49–51 (Page ID #375). And shortly after that individual left the break room, an unidentified individual could be seen entering the building "from the outside." R. 43-13 (Prelim. Examination Tr. at 67) (Page ID #532).

## B. Police Investigation

Dahlin visited FHS on November 28, 2012 to speak with Sonnenfeld about the reported theft. R. 43-7 (Dahlin Dep. at 14–15) (Page ID #401). Sonnenfeld expressed his belief that the cash was stolen during the Thanksgiving break and that the suspect used keys to enter his office and to open the cash box. R. 46-8 (Police Report at 8) (Page ID #1504). Sonnenfeld also

explained that he reviewed the video surveillance and suspected that Zavatson was responsible for the theft. *Id.* at 8–9 (Page ID #1504–05).

Seidl came to the school a couple of days later, on November 30, 2012, and met with the principal. *Id.* at 9 (Page ID #1505). The principal provided Seidl with a flash drive containing the video footage viewed by Skop. *Id.* The principal and Seidl then viewed the footage together. *Id.* Seidl observed in his notes that the principal "pointed out the subject walking up the stairs wearing a hooded jacket. It appeared to be a male subject with skinny legs. . . . There was light in the stairway in which you could make out what the subject was wearing but since subject was wearing the hood up it was difficult to make out any facial features." *Id.* The principal told Seidl that there were only two male custodians working the night of November 20: Zavatson and another individual named Michael McConnell. *Id.* Before the time of the theft, Zavatson was seen entering the break room and McConnell was seen working in another part of the building. *Id.* at 10 (Page ID #1506).

On December 3, 2012, Seidl returned to Fitzgerald to interview the other custodians who worked on November 20, 2012. *Id.* at 10–11 (Page ID #1506–07). Among other information, Seidl learned from these interviews that custodians had access to master keys, which permitted access to all doors in the school. *Id.*; *see also* R. 43-13 (Prelim. Examination Tr. at 67) (Page ID #532). The custodial director informed Seidl during her interview that a person, "if not wanting to be seen," could reach the athletic director's office from the custodian break room by "exit[ing] the break room through the print room, cut[ting] through the cafeteria, [and] then [walking] up

the stairs" to the wing where the athletic director's office is located.  R. 46-8 (Police Report at 11) (Page ID #1507).

Seidl interviewed Zavatson on December 18, 2012, after having made several attempts to conduct an interview in the preceding weeks.  R. 46-8 (Police Report at 11–12 (Page ID #1507–08).  Zavatson acknowledged that he cleaned the athletic director's office two to three times per week, but he could not recall if he cleaned the office on November 20, 2012, and he denied taking money out of that office.  *Id.* at 12 (Page ID #1508).  After his interview with Zavatson, Seidl conducted a test to determine the height of the shadowy figure.  *Id.* at 13 (Page ID #1509). He determined that Zavatson, who was 5′10″, matched the height of the suspect.  *Id.*

The last component of Seidl's investigation before he applied for an arrest warrant was documentation of evidence.  On January 18, 2013, Seidl asked a Warren evidence technician to photograph Sonnenfeld's and Candela's offices, the drawers in which Sonnenfeld and Candela kept the keys to their respective safes, and the cabinets that contained the safes.  *Id.* at 14 (Page ID #1510).

## C.  Arrest Warrant

On January 18, 2013, Seidl submitted a request for an arrest warrant against Zavatson. *Id.*  In the "Summary of Offense" section of the request, Seidl wrote the following:

> On 11-20-12 at 2227 hrs Zavatson, while working at 23200 Ryan he stole money from the Athletic Department's safe located in the Athletic Director's Office. Daniel used keys and safe combo to steal $510 from the safe.  Daniel further stole an additional $250 from the business office safe.  That safe was located in a storage room next to the office.  The keys to the safe and cash box were hidden in two different filing cabinets in his office.  The theft from the Athletic Director's

> Office was caught o[n] video and Daniel is the only custodian matching the physical description of the suspect and is assigned to that area.

R. 43-9 (Warrant Request at 1) (Page ID #456). Heather Odgers, an assistant prosecutor, reviewed and approved Seidl's warrant request. R. 61-8 (Odgers Dep. at 27–28) (Page ID #3804–05). Although Odgers has "no independent memory of the case," *id.* at 11 (Page ID #3788), she stated that she would have reviewed the entire report when determining whether to approve the request, *id.* at 28 (Page ID #3805). When asked if she relied on the "Summary of Offense" section when reviewing Seidl's request, Odgers stated, "Absolutely not," and explained that "this summary of offense is not evidence. It is what [the officer] believe[s] occurred. R. 61-8 (Odgers Dep. at 22, 27–28) (Page ID #3799, 3804–05). However, Odgers also agreed that she "rel[ies] on th[e] statements [made in the "Summary of the Offense,] as well [as] the evidence[,] to support the signing of a complaint felony," *id.* at 23 (Page ID #3800), and she conceded that Seidl's statements in the "Summary of Offense" led her to believe that Seidl knew the date and time of the offense (which was in fact not certain) and had video surveillance of the theft itself (which he did not), and that Zavatson had access to the combination to the safe in the Athletic Department office (which was written on a piece of paper that Sonnenfeld had taped to the back of his desk drawer, "hidden . . . . out of sight"). *Id.* at 18–19, 23–25 (Page ID #3795–96, 3800–02); R. 46-8 (Police Report at 14) (Page ID #1510); R. 43-8 (Seidl Dep. at 121–26) (Page ID #446). In addition, Odgers testified that she would have wanted to know that video evidence showed Zavatson was "in a different area of the school" at the time of the alleged theft, as that

"would [have] ca[st] doubt on the probable cause." R. 61-8 (Odgers Dep. at 30) (Page ID #3803).

Seidl recalled that in addition to the warrant request, he submitted to Odgers the police report, witness statements, the surveillance footage, the video that Seidl created to compare heights, copies of the driver licenses of the teachers that Seidl used in the height comparison, and the photographs of Sonnenfeld's and Candela's offices. R. 43-8 (Seidl Dep. at 104–116) (Page ID #440–43). Odgers did not recall reviewing the surveillance footage from the school, and explained that "[n]ormally if there's mention of a video" in a warrant request, she would either review the video, review pictures from the video, or ask someone else to review the video and provide a summary. R. 61-8 at 24, 31 (Page ID #3801, 3808). Ultimately, Odgers authorized the arrest warrant on January 22, 2013 for two counts of larceny in a building. R. 46-14 (Arrest Warrant) (Page ID #1544) (citing Mich. Comp. Laws Ann. § 750.360).

## D. School Investigation

While Seidl was conducting his investigation, Barbara VanSweden, the superintendent of FPS, asked Wendy Hagerty, a human resource manager, to conduct an internal investigation into the alleged theft. R. 46-9 (Athletic Office Theft Investigation Mem. at 1) (Page ID #1516). On December 4, 2012, Hagerty and Zavatson's supervisor, Melanie Rainwater, met with Zavatson and two union representatives to discuss the case and place Zavatson on paid leave. R. 46-11 (Dec. 6, 2012 Letter to Zavatson from Hagerty) (Page ID #1536). Hagerty reviewed much of the

same evidence as Seidl and concluded that it was "inconclusive" whether Zavatson stole money from the safes.  R. 46-9 (Athletic Office Theft Investigation Mem. at 3) (Page ID #1518).

As a result of this inconclusive determination, Zavatson was told to return to work on January 22, 2013.  R. 46-12 (Jan. 18, 2013 Letter to Zavatson from Hagerty) (Page ID #1538). However, because he was told to report to the police on January 24, 2013, Zavatson "called in sick" without providing a specific reason for his absence.  R. 46-2 (Zavatson Dep. at 67–72) (Page ID #1385–86).  On March 5, 2013, Hagerty informed Zavatson that he was being suspended without pay for failure to report a felony arraignment.  R. 46-17 (Mar. 5, 2013 Letter to Zavatson from Hagerty).

Two days after Rainwater gave Zavatson this suspension letter, Zavatson filed a grievance with his union regarding his unpaid suspension.  R. 46-18 (Official Grievance Form) (Page ID #1553–54).  A "grievance meeting" took place on May 2, 2013, R. 46-19 (Grievance Mem.) (Page ID #1556), at which Zavatson was represented by union representatives, R. 46-2 (Zavatson Dep. at 79) (Page ID #1388).  Zavatson provided no evidence indicating that he had advised FPS of the larceny charges within three days of his arraignment, as required by section 380.1230d(c) of the Michigan Compiled Laws.  *Id.* at 80 (Page ID #1388).  Thus, on May 24, 2013, Hagerty denied Zavatson's grievance, stating that "[n]either Mr. Zavatson nor the union could provide any evidence that Mr. Zavatson complied with State Law."  R. 46-19 (Grievance Mem.) (Page ID #1556).

VanSweden also sent Zavatson a letter on June 7, 2013, notifying him that "[t]he District has completed its review" of the circumstances surrounding his unpaid leave, and that "Fitzgerald Public Schools believes that [Zavatson had] failed to properly advise the District of [his] arraignment on felony charges as required under [section 380.1230d(c)]." R. 46-20 (June 7, 2013 Letter) (Page ID #1558). VanSweeden "offered [Zavatson] the opportunity for a hearing on June 13, 2013 . . . to provide evidence that [Zavatson] did in fact comply with these statutory requirements." *Id.* Zavatson attended this hearing with his attorney and union representatives, and at the hearing, FPS offered Zavatson his job back in exchange for an agreement not to sue them. R. 46-2 (Zavatson Dep. at 82–84) (Page ID #1389). Zavatson rejected FPS's offer, *id.* at 86 (Page ID #1390), and the Fitzgerald Public School Board of Education terminated his employment on June 20, 2013, R. 46-23 (June 21, 2013 Letter to Zavatson from VanSweden) (Page ID #1571). VanSweden denied Zavatson's grievance in the final stage of the grievance process several months later, on December 9, 2013. R. 46-24 (Dec. 9, 2013 Mem.) (Page ID #1573).

**E. Preliminary Examination and Postscript**

On March 4, 2013, the 37th Judicial District Court for the County of Macomb held a preliminary-examination hearing, commonly referred to as a probable-cause hearing, to determine whether there was sufficient probable cause to arrest Zavatson. After hearing testimony from Sonnenfeld, Candela, Skop, and Seidl, R. 43-13 (Prelim. Examination Tr. at 2) (Page ID #467), the state district court found that there was probable cause to support the first

count of larceny (Sonnenfeld's office), but not the second (the accounting office). The district court reasoned that the thief must have used a master key and must have been in the building because the safes were not damaged and there were no reported break-ins at the school. *Id.* at 109–10 (Page ID #574–75). The district court also noted that the surveillance footage depicted an unidentifiable figure entering Sonnenfeld's office and leaving minutes later. *Id.* at 110 (Page ID #575). Finally, the district court relied on the height comparison that Seidl conducted to narrow the list of suspects to Zavatson. *Id.* Nevertheless, the district court dismissed the second count because there was a five-to-six-month period during which the money could have gone missing and there was no comparable evidence of anyone entering the office. *Id.* at 110–11 (Page ID #575–76).

Two days after the preliminary-examination hearing, on March 6, 2013, Seidl had the safes fingerprinted. R. 43-8 (Seidl Dep. at 118) (Page ID #444). Several months later, on May 30, 2013, Seidl requested a latent-print examination of the prints that were lifted. R. 62-17 (Latent Print Examination Request Form) (Page ID #4856). The report that came back indicated that these prints did not match Zavatson's. R. 62-17 (Warren Police Department Forensic Exam Report) (Page ID #4857). Zavatson also voluntarily took a polygraph test on May 24, 2013, in which he was deemed to have truthfully stated that he did not steal money from Sonnenfeld's safe. R. 62-18 (Polygraph Examination Report) (Page ID #4859).

In light of the polygraph test results, Zavatson filed a motion to quash in the Circuit Court for the County of Macomb. R. 62-15 (Mot. Quash Hr'g at 3) (Page ID #4843). Zavatson

11

reiterated that he was in the break room when the suspect was seen entering Sonnenfeld's office and introduced the results of the polygraph test. *Id.* at 4–6 (Page ID #4844–46). The circuit court granted Zavatson's motion to quash, reasoning that the district court "was less than overly persuaded to bind over on this matter, and . . . that . . . the People did not establish probable cause that the Defendant was the person who committed the crime, if there was one committed." *Id.* at 7 (Page ID #4847).

Zavatson subsequently filed this case in the U.S. District Court for the Eastern District of Michigan. In two separate opinions, each addressing a different set of defendants, the district court awarded summary judgment against Zavatson. *Zavatson v. Sonnenfeld*, No. 14-10623, 2016 WL 5340785 (E.D. Mich. Sept. 23, 2016) (Fitzgerald Defs.); *Zavatson v. City of Warren*, No. 14-10623, 2016 WL 3197398 (E.D. Mich. June 9, 2016) (Warren Defs.). Zavatson filed a timely notice of appeal on September 26, 2016. R. 76 (Notice of Appeal) (Page ID #5712).

## II. DISCUSSION

### A. Standard of Review

Courts of appeals review an award of summary judgment de novo. *Voyticky*, 412 F.3d at 675. "[O]n cross-motions for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012) (quoting *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001)) (alteration in original). District courts must "grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And in considering such disputes, courts must "construe the evidence in the light most favorable to [the nonmoving party] and draw all reasonable inferences in his favor." *Voyticky*, 412 F.3d at 675.

Our review is also textured by the qualified immunity that certain defendants have asserted in this case. Because Zavatson brings suit pursuant to 42 U.S.C. § 1983, Zavatson must show that such defendants not only violated his constitutional rights, but that those constitutional rights were clearly established at the time of the alleged violation. *See Bailey v. City of Ann Arbor*, 860 F.3d 382, 385 (6th Cir. 2017). In light of recent Supreme Court decisions, § 1983 plaintiffs simply cannot ignore the "clearly established" prong of their claims. Such litigants must take care to explain how "existing precedent [has] placed the statutory or constitutional question beyond debate" such that reasonable officials would be on notice that a constitutional violation has occurred. *See White v. Pauly*, 580 U.S. ——, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 577 U.S. ——, 136 S. Ct. 305, 308 (2015)). Certain cases may illustrate constitutional principles at "a general level" without clearly establishing a constitutional right. *Id.* at 552 (holding that *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989), "lay out excessive-force principles at only a general level" and do not clearly establish law "outside 'an obvious case'" (quoting *Brosseau v. Haugen*, 543 U.S. 199 (2004))). Thus, unless § 1983 plaintiffs identify clearly established law that is "'particularized' to the facts

of the case," the defendants that they sue are entitled to judgment as a matter of law. *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

## B. False Arrest

Whether under federal or Michigan law, a false-arrest claim requires the "plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Voyticky*, 412 F.3d at 677); *Bletz v. Gribble*, 641 F.3d 743, 758 (6th Cir. 2011) (applying Michigan law). At the outset, Zavatson's false-arrest claims against Sonnenfeld and Candela must fail, as Zavatson has not shown that either FPS employee was an "arresting officer." At most, Zavatson argues that Sonnenfeld and Candela "shaped and directed the information upon which Seidl's investigation was premised, and they persisted in making false or reckless statements about Zavatson's responsibility for the theft." Appellant Br. at 26. However, much as "[p]roviding information to the police, responding to questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken 'under color of law,'" *Moldowan v. City of Warren*, 578 F.3d 351, 399 (6th Cir. 2009), Sonnenfeld and Candela's contact with the police, even in their capacity as school officials, does not expose them to liability for false arrest. Therefore, the district court correctly awarded summary judgment in favor of Sonnenfeld and Candela with respect to Zavatson's federal and state false-arrest claims.

With regard to Seidl, however, Zavatson survives summary judgment on both his federal and state false-arrest claims because he has demonstrated that (1) Seidl, who was indisputably an

"arresting officer," lacked probable cause to arrest Zavatson, and (2) Seidl is not entitled to qualified immunity (with respect to the federal claim) or governmental immunity (with respect to the state law claim).

### 1. Probable Cause

Under federal law, "[p]robable cause is a 'practical, nontechnical conception' that deals with probabilities, not certainties and the 'factual and practical considerations of everyday life.'" *Manley v. Paramount's Kings Island*, 299 F. App'x 524, 528 (6th Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "Police have probable cause to arrest a person when they have 'reasonably trustworthy information that is sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense based on the facts and circumstances within the police's knowledge at the moment in question.'" *Id.* (quoting *Peet v. City of Detroit*, 502 F.3d 557, 563–64 (6th Cir. 2007)). "The probable cause determination is essentially the same under Michigan law: 'Probable cause to arrest exists where the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002) (quoting *People v. Champion*, 549 N.W.2d 849, 860 (Mich. 1996)). Where, as here, a defendant has asserted immunity from suit, "the issue of probable cause is one for the court since 'the entitlement is immunity from suit rather than a mere defense to liability.'" *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

15

When reviewing the information known to Seidl at the time of Zavatson's arrest, we conclude that no reasonable officer could have believed, based on anything more than speculation, that Zavatson had committed the purported theft. As an initial matter, there is no direct connection between Zavatson and the theft. Rather, the evidence shows at most that only custodians were working on the night when an unidentified figure entered Sonnenfeld's office, R. 46-8 (Police Report at 7) (Page ID #1503), that Zavatson was one of these custodians, *id.*, and that Zavatson matched the apparent height and gender of the unidentified figure, *id.* at 13 (Page ID #1509). The evidence also shows that Zavatson, along with the other custodians, had access to a master key that opened the entrance to the school, Sonnenfeld's office, and Candela's office. *Id.* at 10–12 (Page ID #1506–08). Crucially, however, we do not know how many other people had access to a master key. R. 43-13 (Prelim. Examination Tr. at 42) (Page ID #507). Skop also testified that he observed someone come into the building from the outside shortly before an unidentified figure entered Sonnenfeld's office, suggesting that someone who had a master key and who was not working over the Thanksgiving break may have stolen the cash. *Id.* at 67 (Page ID #532). And the undisputed evidence demonstrated that Zavatson left the custodian break room at 10:37 p.m., which was no more than three minutes after the suspected thief exited Sonnenfeld's office. *See* R. 43-5 (Skop Dep. at 34–35) (Page ID #371). Although Seidl's police report noted that a person "not wanting to be seen" could get to Sonnenfeld's office from the custodian break room by exiting from the back door of the break room into the print room, going from the print room across the hall to the cafeteria, cutting across the cafeteria, and walking up

the stairs to the wing where the athletic director's office is located, R. 46-8 (Police Report at 11) (Page ID #1507), his report in no way indicated whether a person could complete this route (or its inverse) in under three minutes—a question that would seem particularly relevant since the break room and Sonnenfeld's office are located at opposite ends of the building, *see* R. 43-13 (Prelim. Examination Tr. at 60) (Page ID #525). Without more evidence limiting the list of suspects, we cannot say that probable cause supported Zavatson's arrest.

### 2. Qualified Immunity (Federal Law)

Notwithstanding the above analysis, qualified immunity protects officers from civil liability so long as they do not violate clearly established constitutional rights by engaging in "objectively unreasonable [conduct] under the circumstances." *Richardson v. Nasser*, 421 F. App'x 611, 616 (6th Cir. 2011) (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)). Reliance on a judicially issued warrant is not "objectively unreasonable," and thus "[a]n arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest . . . made pursuant to § 1983." *Id.* (quoting *Voyticky*, 412 F.3d at 677)). But an officer may not rely "on a facially valid warrant as satisfactory evidence of probable cause 'when evidence exists that a defendant intentionally mislead or intentionally omitted information [to obtain the warrant] . . . provided that the misleading or omitted information is critical to the finding of probable cause.'" *Id.* (quoting *Voyticky*, 412 F.3d at 677 n.4)). Put differently, an officer is not entitled to qualified immunity if a § 1983 plaintiff makes "(1) a substantial showing that [the officer] stated a deliberate falsehood or showed reckless disregard

for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." *Id.* (quoting *Vakilian*, 335 F.3d at 517)).

Here, a reasonable jury could conclude that Seidl made deliberately false statements and intentional omissions in his warrant application that were material to Odgers's finding of probable cause. For example, in the "Summary of Offense" in his warrant request, Seidl stated that video surveillance showed Zavatson committing the crime, which it did not; Seidl stated that the theft occurred on a particular date and time, when in fact that information was uncertain; and Seidl failed to note that video surveillance placed Zavatson at the opposite end of the school three minutes after the suspect exited Sonnenfeld's office. *See* R. 43-9 (Warrant Request at 1) (Page ID #456). Seidl insists that none of these misstatements or omissions should be considered material because Odgers "specifically testified that the summary of the offense was not evidence, that she would rely upon the investigative report and supporting materials in support of her probable cause determination, and would 'absolutely not' rely upon the summary." Warren Def. Br. at 31–32. But Odgers's testimony is in fact inconsistent on this point. She testified that she "probably" relied on Seidl's "represent[ation in] the summary of the offense" that "the theft from the athletic director's office was caught on video" in "sign[ing] the complaint felony." R. 61-8 (Odgers Dep. at 24) (Page ID #3801). And while Odgers insisted that she would have reviewed the investigative report and supporting materials, she testified that she did not recall watching the video and would not have necessarily reviewed the video herself, *id.* at 31 (Page ID #3808), and

if she had known that Zavatson "was in a different area of the school at the time" of the offense, "[i]t would [have] ca[st] doubt on the probable cause," *id.* at 26 (Page ID #3803).

Discrepancies between Seidl's warrant request and his later testimony in this case also lend credence to the notion that Seidl's misstatements were intentional. For example, Seidl claims that he told Odgers in person, when he presented the warrant request, that he "could not identify the face on the person" in the video. R. 43-8 (Seidl Dep. at 63) (Page ID #430). The warrant request, by contrast, makes no mention of this limitation in the video surveillance and states instead that "[t]he theft from the Athletic Director's Office was caught o[n] video and Daniel is the only custodian matching the physical description of the suspect." R. 43-9 (Warrant Request at 1) (Page ID #456). Odgers does not corroborate Seidl's testimony, as she has no recollection of the case and does not remember whether she had any "independent conversations" with Seidl. R. 61-8 (Odgers Dep. at 15) (Page ID #3792). A jury need not credit Seidl's unsubstantiated testimony that he spoke with Odgers regarding the flaws in the video surveillance; a jury could instead infer, based on the fact that Seidl now claims he verbally relayed this information to Odgers, that Seidl recognized the information was important and deliberately withheld it from his report. The district court therefore erred in holding that qualified immunity operated, at the summary-judgment stage, to shield Seidl from liability with respect to Zavatson's federal false-arrest claim.

### 3. Governmental Immunity (State Law)

We reach a similar conclusion with regard to Zavatson's state-law false-arrest claim. Under Michigan law, a government "employee enjoys a right to immunity if (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the employee undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature." *Bletz*, 641 F.3d at 757 (citing *Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008)). It is undisputed that Seidl requested Zavatson's arrest warrant and ultimately arrested Zavatson during the course of Seidl's employment and within the scope of his authority. There is also no doubt that Seidl's actions were discretionary, as he conducted his own investigation and was not obligated to request an arrest warrant. However, we hold that there is a genuine issue of material fact regarding Seidl's good faith.

The Michigan Supreme Court "has described a lack of good faith as 'malicious intent, capricious action or corrupt conduct' or 'willful and corrupt misconduct.'" *Odom*, 760 N.W.2d at 225 (internal citations omitted). "[W]illful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Id.* (quoting *Burnett v. City of Adrian*, 326 N.W.2d 810, 812 (Mich. 1982)). In order to avail himself of governmental immunity, "the proponent of individual immunity must establish that he acted without malice." *Id.*

We believe that a reasonable jury could conclude, based on Seidl's incomplete investigation and misleading arrest-warrant request, that he did not act with good faith. First, as discussed above, the summary-of-offense section of the arrest-warrant request contained several misleading statements from which a reasonable juror could conclude that Seidl was searching for a reason to arrest Zavatson without probable cause.

Second, lack of good faith could be inferred from Seidl's incomplete investigation. Under Michigan law, a jury can infer that an officer who "deliberately ignored exculpatory evidence produced during his investigation . . . . was deliberately indifferent to [the arrestee's] liberty interest" and therefore acted in "bad faith." *Flones v. Dalman*, 502 N.W.2d 725, 728 (Mich. 1993). Here, Seidl failed to take basic investigatory steps that would have revealed exculpatory evidence and called into serious doubt Zavatson's responsibility for the alleged thefts. For instance, Seidl did not secure the safe in either office, and he did not request a fingerprint examination of Sonnenfeld's safe until May 30, 2013, several months after he requested an arrest warrant for Zavatson. R. 62-17 (Latent Print Examination Request Form) (Page ID #4856). It turns out, of course, that Zavatson's fingerprints were not detected on the safe. R. 62-17 (Forensic Exam Report) (Page ID #4857). More broadly, Seidl investigated only custodians, even though anyone with a master key could access the offices from which the money was stolen. And despite the fact that Zavatson offered to take a polygraph test in December 2012, R. 46-8 (Police Report at 12–13) (Page ID #1508–09), Seidl requested Zavatson's arrest warrant before obtaining the results of the test. The polygraph test results

21

indicated that Zavatson truthfully denied stealing money from FHS or from Sonnenfeld's cash box in particular. R. 62-18 (Polygraph Examination Report) (Page ID #4859). Upon reviewing these test results, alongside the other evidence, the state court dismissed the last remaining larceny charge against Zavatson. R. 62-15 (Mot. Quash Hr'g Tr. at 7) (Page ID #4847). In view of these shortcomings, we believe that a reasonable jury could find that Seidl lacked good faith in arresting Zavatson. Therefore, we hold that Seidl is not entitled to governmental immunity or summary judgment with respect to the state false-arrest claim.

## C. Malicious Prosecution

Zavatson also appeals the district court's decision on his malicious-prosecution claims. At the federal level, this tort, which is "'entirely distinct' from that of a false arrest," *Sykes*, 625 F.3d at 308 (quoting *Wallace v. Kato*, 549 U.S. 384, 390 (2007)), requires a showing "that (1) a criminal prosecution was initiated against [the plaintiff] and [the defendant] made, influenced, or participated in the prosecution decision; (2) there was no probable cause to support the charges; (3) as a result of the legal proceedings, [the plaintiff] suffered a deprivation of liberty 'apart from the initial seizure'; and (4) the criminal proceedings ended in [the plaintiff's] favor," *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (quoting *Sykes*, 625 F.3d at 308–09). Plaintiffs must also make "an 'effort to identify what that false and misleading information was.'" *Bickerstaff v. Lucarelli*, 830 F.3d 388, 398 (6th Cir. 2016) (quoting *Meeks v. Larsen*, 611 F. App'x 277, 282 (6th Cir. 2015)). Under Michigan law, the tort contains largely the same elements. *See Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603, 609–

22

10 (Mich. 1998). However, there is an additional requirement in Michigan "that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice." *Id.* at 610; *see also Sykes*, 625 F.3d at 309 (holding that the Sixth Circuit does not "require[] that a plaintiff demonstrate 'malice' in order to prevail on a Fourth Amendment claim for malicious prosecution").

The district court properly awarded summary judgment to Sonnenfeld and Candela with regard to Zavatson's federal- and state-law malicious-prosecution claims, as there is no evidence that either defendant "made, influenced, or participated in the prosecution decision." *Miller*, 2017 WL 3298570, at *1. On appeal, Zavatson's claim against Sonnenfeld and Candela boils down to an allegation that they "professed to have knowledge about exactly when the theft occurred when, in fact, their information was entirely speculative," and that their false statements "influence[d] the way that police understood the alleged crime" and "made it substantially more likely that Zavatson would be arrested and prosecuted." Appellant Br. at 53–54. However, Candela never stated that he knew precisely when the alleged theft had occurred. *See* R. 46-8 (Police Report at 14) (Page ID #1510) (Seidl relaying conversation with Candela, in which Candela does not specify when he believes the alleged theft occurred); R. 43-13 (Preliminary Examination Tr. at 34–37) (Page ID #499–502) (Candela testifying that he had not looked at the money in the petty cash box between June 2012 and his discovery that money was missing on November 27, 2012).

Zavatson's claims against Sonnenfeld fail for similar reasons. First, to the extent Zavatson seeks to argue that Sonnenfeld's reporting of the crime as a whole was false (i.e., made up that a theft had occurred at all), no evidence supports this allegation. If Zavatson instead means that Sonnenfeld erroneously directed the police toward November 20, 2012, rather than another date during Thanksgiving break, the record does not indicate that Sonnenfeld identified the precise date of the theft with certainty. Rather, Dahlin's and Seidl's initial police reports stated that the theft occurred "during the Thanksgiving break," R. 46-8 (Police Report at 7–8) (Page ID #1503–04), and Seidl later testified that Sonnenfeld had said that "between this date and this date the money was missing," R. 43-13 (Prelim. Examination Tr. at 92) (Page ID #557). Second, even if Sonnenfeld had intimated in his initial report to the police that the theft had occurred on November 20, 2012, no reasonable jury could believe that this statement influenced the government's decision to prosecute Zavatson. Seild learned during the course of his investigation that Skop had reviewed "all the surveillance footage" after "bring informed that there had been a theft from the Athletic Director's office during Thanksgiving break," and that Skop had spotted an unidentified figure entering Sonnenfeld's office at 10:28 p.m. on November 20, 2012 and leaving several minutes later. *See* R. 46-8 (Police Report at 12) (Page ID #1508). Seidl referenced the video surveillance itself—not Sonnenfeld's assertion as to the date of the alleged theft—in his request for an arrest warrant. *See* R. 43-9 (Warrant Request at 1) (Page ID #456). This case is thus unlike *Sykes*, where we held that a sergeant was not entitled to summary judgment on the plaintiffs' malicious-prosecution claim because "it [wa]s apparent from the

record that the prosecution actually relied on many of [the sergeant's] falsehoods in proceeding against the Plaintiffs by reproducing many of the same material misrepresentations of evidence that [the sergeant] had made." 625 F.3d at 316. Here, there is no evidence to suggest that Seidl or the prosecutor relied on Sonnenfeld's assertions regarding the date of the theft as opposed to Skop's representations regarding what he saw in the videos during Thanksgiving break. Seidl's faith in Skop's investigative efforts may have been troubling, but it does not render Sonnenfeld liable for Zavatson's prosecution.

Finally, summary judgment in favor of Candela and Sonnenfeld as to Zavatson's state-law malicious-prosecution claim was appropriate for the additional reason that "the prosecutor's exercise of his [or her] independent discretion in initiating and maintaining a prosecution is a complete defense to an action for malicious prosecution" against private defendants under Michigan law. *See Matthews*, 572 N.W.2d at 613 (citing *Christy v. Rice*, 116 N.W.200, 200 (Mich. 1908)). Though this defense falters if "the information furnished was known by the giver to be false and *was the information on which the prosecutor acted*," *id.*, such circumstances were not present in this case as to Candela and Sonnenfeld.

Seidl was also entitled to summary judgment on Zavatson's malicious-prosecution claims. Although Zavatson has been more detailed on appeal in identifying the allegedly false and misleading information attributed to Seidl, such detail was lacking in his summary-judgment briefing. Zavatson pointed to no false and misleading information in his discussion of malicious prosecution. *See* R. 61 (Pl.'s Mot. Summ. J. at 21–22) (Page ID #3521–22); R. 62 (Pl.'s Resp. to

Warren Defs.' Mot. Summ. J. at 28–29) (Page ID #4242–43); *see also City of Warren*, 2016 WL 3197398, at *14 n.11. This lack of specificity alone is sufficient to award summary judgment against Zavatson. *See Bickerstaff*, 830 F.3d at 398.

Even if this court were to consider the merits of Zavatson's arguments on appeal, the malicious-prosecution claims nevertheless fail. The entirety of alleged misstatements and omissions were contained in Seidl's investigatory materials. *See* Appellant Br. at 43–44. But to survive summary judgment, Zavatson was "required to present some evidence that the impact of [the officer's] misstatements and falsehoods in his investigatory materials extended beyond [Zavatson's] initial arrest and ultimately influenced [Zavatson's] continued detention." *Sykes*, 625 F.3d at 316. Though Seidl's statements may have influenced Odgers's decision to grant Seidl's request for a warrant, as we discussed above, there is no analogous evidence indicating that Seidl's statements influenced the prosecutors who chose to proceed with a case against Zavatson after his arrest. Moreover, no jury could conclude that the statements in Seidl's warrant request swayed Judge Faunce's decision to bind Zavatson over for trial, as Seidl corrected those inaccurate or misleading statements while testifying at the preliminary hearing. For instance, Seidl explained that he did not review the full surveillance footage from November 20, 2012, R. 43-13 (Prelim. Examination Tr. at 95) (Page ID #560); he did not know "if there was anybody else in the building" on the night of November 20, 2012, *id.* at 93 (Page ID #558); he did not know with certainty that the theft had occurred on November 20, 2012, *id.* at 92 (Page ID #557); and he could not identify the gender, face, or race of the person identified as entering

the athletic director's office on the night of November 20, 2012, nor could he identify that person as Zavatson, *id.* at 92–93 (Page ID #557–58).  In *Skykes*, we noted that a trial court's awareness of the falsity of an officer's prior testimony would "dispositive[ly]" demonstrate that the trial court had not "then relied on those falsehoods to bind the Plaintiffs over for trial."  *See* 625 F.3d at 314 n.12.  Thus, although Seidl's misstatements and omissions may have influenced Zavatson's initial arrest, there is no indication that those statements contributed to Zavatson's continued prosecution.

## D.  Failure to Train and Failure to Supervise

Zavatson also appeals the district court's award of summary judgment in favor of the City of Warren with respect to the failure-to-train and failure-to-supervise claims.  "Under § 1983, we may hold a city liable for a constitutional tort 'if the injury is caused by a municipal custom or policy, or if the city's failure to train employees amounts to deliberate indifference to constitutional rights.'"  *Bailey*, 860 F.3d at 388 (quoting *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017)).  "To succeed on a failure to train or supervise claim, the plaintiff must prove the following:  (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury."  *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

With respect to the first prong, perhaps a reasonable jury could conclude that two weeks of "[o]n-the-job training," R. 43-8 (Seidl Dep. at 52–53) (Page ID #427–28), would not prepare

an officer to identify probable cause to arrest individuals. Probable cause, a fact-dependent concept, requires an officer to be aware of common encounters and the case law surrounding those encounters. Although probable cause is "a practical, nontechnical conception," *Manley*, 299 F. App'x at 528 (quoting *Gates*, 462 U.S. at 286), it is nevertheless a concept that may require more than two weeks of on-the-job training.

Zavatson cannot, however, survive summary judgment with respect to the second prong. "Deliberate indifference" is a "stringent standard of fault," *Harvey v. Campbell Cty.*, 453 F. App'x 557, 563 (6th Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)), and it can be demonstrated in two ways: First, a plaintiff could show "prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Plinton v. Cty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). Alternatively, a plaintiff could establish deliberate indifference based on "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Id.* (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).

Here, Zavatson has made no effort to demonstrate a pattern of unconstitutional conduct. And a municipality may be held liable without "a pattern of past misconduct" only when the record shows "a complete failure to train the police force, or training that is so reckless or grossly

negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted). It is hard to say that Zavatson has satisfied this stringent standard, especially when evidence of inadequate training goes exclusively to the length and format of Seidl's training, rather than its content. While it is perhaps troubling that the City of Warren provided no formal training to Seidl "with regard to gathering probable cause in order to secure an arrest warrant," or with respect to "illegal search and seizure" under the Fourth Amendment, *see* R. 43-8 (Seidl Dep. at 52–53) (Page ID #427–28), there is nevertheless no evidence, beyond Seidl's own conduct, that his "on-the-job" training was in fact deficient. *See Miller v. Calhoun Cty.*, 408 F.3d 803, 816 (6th Cir. 2005) (affirming summary judgment against plaintiff on a failure-to-train claim because the plaintiff failed to offer "evidence beyond the facts of this case tending to show that the [municipality's] training and staffing policies were inadequate"). Without greater insight into the nature of the "on-the-job" training that Zavatson received, a jury could not reasonably conclude that the training was so "reckless or grossly negligent that future police misconduct is almost inevitable." *Hays*, 668 F.2d at 874.[1]

## E. Procedural Due Process

The last issue that Zavatson raises on appeal is the district court's dismissal of his procedural-due-process claim. "[W]e have held that prior to termination of a public employee who has a property interest in his employment, the due process clause requires that the employee

---

[1]Because a reasonable jury could not find that the City of Warren was deliberately indifferent to Zavatson's Fourth Amendment rights, we need not decide whether Seidl's presumptively inadequate training was "closely related to or actually caused the injury." *Pendergrass*, 455 F.3d at 700.

be given 'oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer.'" *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004) (quoting *Buckner v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir. 1990). On appeal, Zavatson does not argue that he lacked notice of the charges against him, an explanation of the Fitzgerald Defendants' evidence, or an opportunity to present his side of the story. Indeed, in his deposition testimony, Zavatson largely agrees that he received notice and an opportunity to be heard. R. 46-2 (Zavatson Dep. at 65–67, 81–105) (Page ID #1384–85, 1388–94).

Rather, Zavatson argues that the disciplinary proceedings were a "sham," and that the Fitzgerald Defendants actually terminated him because they wrongfully believed that he had stolen money from FHS. Appellant Br. at 56–57. In support of his claim, Zavatson points to *Bettio v. Village of Northfield*, 775 F. Supp. 1545 (N.D. Ohio 1991), and *Wagner v. City of Memphis*, 971 F. Supp. 308 (W.D. Tenn. 1997), as examples of cases where a pretermination hearing violated an employee's right to due process because "the bias [against the employee] was so harmful as to totally defeat the concerns and goals of the hearing." *Bettio*, 775 F. Supp. at 1564. But these cases are readily distinguishable. In *Wagner*, for instance, the official presiding over the plaintiff's pretermination hearing had been instructed, ex ante, to terminate the plaintiff "regardless of the proof presented" at the hearing. 971 F. Supp. at 319. There is no analogous evidence here to suggest that the officials presiding over Zavatson's hearing lacked discretion to decide against termination.

Likewise, in *Bettio*, the plaintiff alleged that the officials presiding over his pretermination hearing "knew that the charges [that led to the hearing] were false." 775 F. Supp. at 1564–65 (internal citations omitted). Here, by contrast, Zavatson does not dispute that the given reason for his termination was in fact true—i.e., that he had failed to report his larceny charges. Michigan law required Zavatson to report certain criminal charges, including larceny, to FHS within three days after being arraigned. *See* Mich. Comp. Laws Ann. § 380.1230d(1). Zavatson was arraigned on two counts of larceny in a building, R. 46-15 (Disposition of Arraignment) (Page ID #1546), which is a felony under Michigan law, Mich. Comp. Laws Ann. § 750.360. And Zavatson acknowledges that he never reported these larceny charges to anyone at FHS. R. 46-2 (Zavatson Dep. at 73–77) (Page ID #1386–87). Zavatson was given a hearing and an opportunity to be heard, and the record unequivocally supports the given reason for his termination. Under these circumstances, no reasonable jury could conclude he was denied due process.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment with respect to Zavatson's false-arrest claims against Seidl under 42 U.S.C. § 1983 and Michigan law. We **AFFIRM** the judgment with respect to the federal and state false-arrest claims against Sonnenfeld and Candela; the federal and state malicious-prosecution claims against Seidl, Sonnenfeld, and Candela; the failure-to-train and failure-to-supervise claims against the City of Warren; and the procedural-due-process claim against the Fitzgerald Defendants.

31