NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0528n.06

Case No. 22-1082

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="2"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>    Plaintiff-Appellant,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>ON APPEAL FROM THE</td></tr>
<tr><td>v.</td><td>)</td><td>UNITED STATES DISTRICT</td></tr>
<tr><td></td><td>)</td><td>COURT FOR THE WESTERN</td></tr>
<tr><td>KENNETH POINTER,</td><td>)</td><td>DISTRICT OF MICHIGAN</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>    Defendant-Appellee.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>O P I N I O N</td></tr>
</table>

**FILED**
Dec 20, 2022
DEBORAH S. HUNT, Clerk

Before: CLAY, GIBBONS, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Defendant Kenneth C. Pointer appeals his conviction and sentence for several drug-related federal offenses. He argues that evidence discovered in a search of an apartment connected to him should be suppressed due to lack of probable cause for the search, as (1) there was an insufficient nexus established in the warrant affidavit between the apartment and criminal activity and (2) the affidavit contained stale and false information. Pointer further alleges that evidence seized after his car was searched during a traffic stop should be suppressed as the fruit of an unconstitutional search. Finally, Pointer argues that his sentence was procedurally and substantively unreasonable. Because there was sufficient evidence to establish probable cause for both searches, and because his sentence is neither procedurally nor substantively unreasonable, we affirm Pointer's judgment and sentence.

**I.**

**1. Facts**

Pointer, currently forty-seven years old, grew up in Detroit. Police investigated Pointer and another man, Anthony Garner, for drug activity between April 2017 and November 2019. Both men have a long history of involvement with the criminal justice system. Pointer was convicted of several drug offenses throughout his life, with multiple other arrests, drug-related and otherwise. Garner has multiple charges and convictions related to homicide, weapons offenses, larceny, voluntary manslaughter, assault and battery, gambling violations, and a 2010 drug offense. In 2014, Pointer's then-girlfriend turned over money to Tri-County Metro investigators and stated that the money was a portion of Pointer's proceeds from drug manufacturing and sales. At the time of the 2017-2019 investigation, neither Pointer nor Garner had an apparent legitimate source of income. During the investigation, officers surveilled at length an apartment frequented by Pointer and Garner at 3019 Woodruff Avenue, #2 in Lansing (the "Woodruff Apartment"). Several aspects of the investigation into Pointer and Garner are relevant to this appeal.

*a.) 2017 Controlled Buys*

Tri-County Metro investigators conducted four controlled buys from Pointer and/or Garner in 2017 via confidential informant ("CI"). On April 13, 2017, the investigators used a CI to arrange to purchase cocaine from Garner in a parking lot. Pointer and Garner arrived at the meeting together, and Garner exchanged cocaine with the CI for money. On May 10, 2017, the Tri-County Metro investigators conducted another controlled buy with Garner through the same CI. Garner showed up to the meeting by himself, briefly met with the CI, exchanged the drugs for money, and left.

On June 7, 2017, the CI once again contacted Garner to purchase drugs, at the behest of the Tri-County Metro investigators. The CI was told by Garner that Garner did not currently have any crack and would need to have someone manufacture it. That night, Garner and Pointer were seen entering the Woodruff Apartment building together by officers surveilling the apartment. Garner then contacted the CI and told him that he had obtained the crack. The next day, Garner and Pointer met again at the Woodruff Apartment building and went inside; later, Garner left, went to the parking lot, met with the CI, and completed the exchange.

On October 5, 2017, the Tri-County Metro investigators again had the CI ask Garner to sell him crack. Garner said he did not have it and would need to have someone manufacture it. Garner went to a location in Detroit, then drove to the Woodruff Apartment building and met Pointer outside, going in together. Garner then told the CI that the crack was ready and that Pointer would deliver it. On October 6, 2017, Pointer arrived at the parking lot by himself and gave crack to the informant in exchange for money.

*b.) May 24, 2017 Traffic Stop*

On May 24, 2017, Pointer was pulled over by police while driving for a traffic violation. At that stop, he was arrested for possession of marijuana, and when he was searched incident to the arrest officers found 17.5 grams of crack on his person, which was divided up into many individually-wrapped rocks.

*c.) Other Suspicious Activity*

Pointer and Garner were also observed participating in various other suspicious activities indicative of drug crimes. On June 29, 2017, officers saw three people separately enter Pointer's vehicle for a brief moment, then leave. On August 17, 2017, Pointer was seen entering the Woodruff Apartment building and then exiting with a duffel bag, which he brought to another

residence before going back to the Woodruff Apartment. He then left the apartment and went to another parking lot where he had a brief meeting with a woman. On October 30, 2017, Pointer was observed in a similarly brief meeting. The next day, Garner was seen receiving a large amount of cash in another parking lot, then leaving to meet with Pointer.

*d.) The Search of the Woodruff Apartment*

Additionally, Pointer and Garner were seen multiple times entering and exiting the Woodruff Apartment building, though they primarily lived at other residences. Pointer drove a car which he frequently parked in the parking spot assigned to the Woodruff Apartment. He was also seen with the leaseholder of the apartment on multiple occasions.

On December 11, 2017, Tri-County Metro investigators obtained a search warrant for the Woodruff Apartment from the 56th District Court for the State of Michigan. The affidavit supporting the warrant contained the information described above concerning the controlled buys, the apartment, the traffic stop and drug seizure, the apparent hand-to-hand deals, Pointer and Garner's previous arrests/convictions, and the 2014 incident with Pointer's then-girlfriend. The warrant sought drugs, drug trafficking implements and paraphernalia, and documents such as records of residency and ownership. The warrant was executed the next day, during which time the investigators recovered a large amount of drugs and drug paraphernalia. The investigators also discovered several personal effects of Pointer's in the apartment, including a copy of his driver's license and medical marijuana card, mail addressed to him, and an Xfinity bill for the apartment in his name. They also found a large amount of cash. The investigators arrested Pointer that same day, finding cash on him as well as keys to the Woodruff Apartment.

*e.) 2019 Controlled Buys*

Lansing Police also used a CI to purchase crack cocaine in controlled buys from Pointer in 2019. These controlled buys occurred on four separate occasions between July and September 2019.

*f.) November 7, 2019 Traffic Stop*

Following the controlled buys, on November 7, 2019, officers tailed Pointer as he drove alone from the Detroit area towards Lansing. Pointer was observed to be speeding by a Michigan State Police Trooper, who was working with the Lansing Police. When the trooper approached in his car, Pointer suddenly jerked into the right lane, cutting off another car. The trooper then pulled Pointer over, at which time the trooper smelled burnt marijuana and saw marijuana in the center console of the car. The trooper also saw a wad of cash on Pointer's person. The trooper requested that Pointer step out of the car, which Pointer did. The trooper brought a drug-alert canine to the car approximately nine minutes after the stop was initiated, and the dog positively indicated the presence of drugs. Officers then searched the car and found over a thousand grams of cocaine. Pointer was subsequently arrested, at which time the officers found a keyring on his person. The next day, Lansing Police officers executed a search warrant at an apartment on Hartford Road in Lansing where Pointer had been seen on several occasions. The officers used a key found on the keyring to open a safe in the apartment, where they found a collection of drugs.

**2. Procedural History**

On December 18, 2019, a grand jury indicted Pointer for: (1) distribution of cocaine and aiding and abetting distribution of cocaine, (2) distribution of cocaine base, (3) distribution of controlled substances and aiding and abetting distribution of controlled substances, (4) possession

with intent to distribute cocaine, and (5) possession with intent to distribute cocaine base, all in violation of 21 U.S.C. § 841(a)(1).

During the course of trial, Pointer filed several motions to suppress, which the district court denied. He moved to suppress evidence seized in the search of the Woodruff Apartment, alleging that the information in the affidavit supporting the warrant was stale and failed to establish a nexus between drug activity and the apartment. The district court denied the motion, finding that the evidence sufficiently demonstrated that Garner and Pointer maintained an ongoing drug operation, using the Woodruff Apartment as their base, which was adequate to defeat the staleness argument and create probable cause tying the apartment to drug activity. Pointer also moved to strike as false certain statements in the warrant affidavit regarding officers' observation of Pointer entering/exiting the Woodruff Apartment. The district court denied this motion as well, finding that the statements were not intentionally or recklessly false, as well as not necessary to the finding of probable cause. Finally, Pointer moved to suppress the fruits of the November 7, 2019 search, arguing that the search was unconstitutional. The district court denied the motion, finding that the officers had probable cause to search the car and thus the automobile exception to the warrant requirement applied.

The jury convicted Pointer on all charges. During sentencing, Pointer objected to the "drug-house" enhancement under U.S.S.G. § 2D1.1(b)(12) suggested in his presentence report. The district court overruled this objection, finding that there was evidence demonstrating that Pointer maintained the Woodruff Apartment for the purposes of making and/or distributing drugs, sufficiently supporting the enhancement's application. However, this enhancement did not affect Pointer's total offense level, as Pointer fell into the career offender category, making his total offense level 37 automatically, with a criminal history category of VI. The district court

accordingly calculated his guidelines range as 360 months to life, and sentenced Pointer to 360 months' incarceration on each count, to be served concurrently.

**II.**

Pointer raises three main issues on appeal: (1) the sufficiency of the warrant affidavit for the search of the Woodruff Apartment, (2) the constitutionality of the 2019 traffic stop and search of his vehicle, and (3) the procedural and substantive reasonableness of his sentence. We address each in turn.

### 1. The Search of the Woodruff Apartment[1]

Pointer argues that the search of the Woodruff Apartment was unconstitutional, as the affidavit supporting the search warrant failed to establish probable cause. Specifically, he claims that there was an insufficient nexus between criminal activity and the apartment, that information contained in the affidavit was too stale to support probable cause, and that a statement in the affidavit was both material and false. We find that there was probable cause to support the search and reject Pointer's staleness and falsity arguments.

#### a.) Standard of Review

This Court reviews a district court's legal determinations in a probable cause inquiry de novo and its factual findings for clear error. *United States v. Hines*, 885 F.3d 919, 924 (6th Cir. 2018). In cases such as this one, where "the district court has denied the motion to suppress, we review all evidence in a light most favorable to the Government." *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (quoting *United States v. Galloway*, 316 F.3d 624, 628 (6th Cir. 2003)).

---

[1] Pointer devotes a not insubstantial portion of his brief to demonstrating that he has standing to challenge this search. However, the government does not contest standing, and we see no reason to doubt that Pointer has standing as a frequent occupant of the apartment who paid bills there. *Cf. United States v. Pruitt*, 458 F.3d 477, 487 (6th Cir. 2006) (Clay, J., concurring) (acknowledging that even a mere overnight guest can have standing to challenge a search).

Where, as here, the search warrant was approved by a state magistrate, the underlying standard of review asks only whether the magistrate had a substantial basis for concluding that probable cause for the search existed. *See United States v. Christian*, 925 F.3d 305, 310 (6th Cir. 2019). As this Court has noted in the past, "the Supreme Court has repeatedly said that after-the-fact scrutiny . . . should not take the form of *de novo* review." *United States v. Kinison*, 710 F.3d 678, 681–82 (6th Cir. 2013) (cleaned up). Rather, great deference is owed to the state magistrate's initial probable cause determination. *Id.* at 682. Probable cause to search a particular place exists where, under the totality of the circumstances, there is "a fair probability that contraband or evidence of a crime will be found" there. *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387–88 (6th Cir. 2017) (quoting *United States v. Brown*, 857 F.3d 334, 339 (6th Cir. 2017)). In reviewing a state magistrate's determination, this Court may consider "only the sworn information provided to the state judge." *United States v. Sheckles*, 996 F.3d 330, 338 (6th Cir. 2021).

    *b.) Nexus*

    In order for there to be probable cause to support a search warrant for a location, courts "have long held that a probable-cause nexus must connect" the intended "place to be searched and the things to be seized." *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021) (cleaned up). In other words, "[t]here must be a fair probability that the specific place that officers want to search will contain the specific things that they are looking for." *Id.* In general, there must be a nexus between criminal activity and the place to be searched in order to search that location. *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008).

    Pointer argues that there was not a sufficient nexus between criminal activity and the Woodruff Apartment to constitute probable cause to search the apartment. As Pointer notes, the application of the nexus standard to searches of a suspected drug dealer's home is not always clear.

This Court in *Reed* detailed this dilemma. *See Reed*, 993 F.3d at 444, 447–49 (noting that this Court has "'struggled' to answer this question in a consistent way"). However, *Reed* did not, as Pointer implies, overhaul the entire nexus analysis in the drug-dealer context. It merely acknowledged that the analysis is difficult, noted "several recurring factors" in the analysis to "promote greater consistency," and "reconciled [the] caselaw [on this issue] in fact-specific ways." *Reed*, 993 F.3d at 447–48; *see also Sheckles*, 996 F.3d at 342 (citing *Reed*, 993 F.3d at 448–50) (stating that the case law on this issue is not contradictory and has been reconciled).

Specifically, the *Reed* Court provided several important guiding factors in the analysis. First, "obviously, a court need not rely on a known drug dealer's status *alone* whenever other evidence (besides the dealer's living there) links drug dealing to the dealer's home." *Reed*, 993 F.3d at 448 (emphasis in original). Further, "[e]ven if no specific evidence ties drug dealing to a home, we have also called it 'well established' that a nexus to search the home can exist if a suspect's drug dealing is 'ongoing' at the time the police seek the warrant." *Id.* As this Court later stated, continual operations typically involve "large amounts of drugs," though the "caselaw 'leaves unclear the amount of drug activity required to invoke this nexus principle.'" *Sheckles*, 996 F.3d at 342 (quoting *Reed*, 993 F.3d at 451).

Pointer's argument that there is an insufficient nexus between drug activity and the Woodruff apartment fails because circumstantial evidence indicates that Pointer and Garner used the apartment as a base for ongoing drug-manufacturing and drug-dealing operations. Pointer and Garner were observed entering and exiting the apartment building frequently over the course of several months, with Pointer parking in the spot assigned to Apartment 2.[2] On June 7, 2017, both

---

[2] The criminal activity linked to the Woodruff Apartment need not directly relate to Pointer himself; any criminal activity linked to the apartment may support a determination of probable cause to search it, as the requisite nexus is merely between the activity and the location, not the defendant and the activity/location.

Garner and Pointer entered the apartment building after Garner indicated to the CI that he needed somebody to manufacture crack for him for their deal. Later that night, Garner told the CI that the drugs were ready. The next day, Garner and Pointer returned to the Woodruff Apartment building, after which Garner traveled directly to the deal, selling drugs to the CI. Similarly, on October 5, 2017, Garner told the CI that he did not have any crack and needed someone to manufacture it; Garner then met with Pointer outside the apartment building, and they went inside together. Garner then told the CI the drugs were ready. The next day, Pointer sold drugs to the CI. These facts constitute circumstantial evidence that Pointer and Garner used the Woodruff Apartment to manufacture drugs.

Further, the Woodruff apartment is not even Pointer's or Garner's residence, and Pointer provides no specific reason for his frequent use of the apartment. Pointer offers this fact as support for a lack of nexus, but logic counsels the opposite: his frequent visits to an apartment that is not his residence raise the question of why he even visited there, constituting circumstantial evidence that wrongdoing is afoot.

This is more evidence linking criminal activity with the place to be searched than in *Reed*, where the affidavit supporting the search warrant "contained no allegations that [the defendant] conducted drug activity at his home." *Reed*, 993 F.3d at 446. *Reed* relied on the good faith exception, and did not decide the nexus issue, but noted that the nexus issue in that case was a close call. *See id.* at 449–50 ("[T]he facts of this case sit on the hazy constitutional border between a sufficient nexus and an insufficient hunch."). The nexus evidence here is also at least comparable to, if not greater than, that found sufficient in *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011) ("Commission of a drug transaction outside of a house and one participant's walking back into the house . . . plainly demonstrated a sufficient nexus with the house."), and *United States v.*

*Houser*, 752 F. App'x 223, 224–26 (6th Cir. 2018) (adequate nexus where the defendant exited his apartment, conducted a hand-to-hand drug deal, and went back inside his apartment).[3]

In combination with the circumstantial evidence linking the apartment to drug activity, there is also evidence that Pointer was involved in an "ongoing" drug conspiracy, bolstering the case for probable cause for the search. *See Reed*, 993 F.3d at 448 ("[A] nexus to search the home can exist if a suspect's drug dealing is 'ongoing' at the time the police seek the warrant."). Pointer and Garner were involved in four controlled drug buys between April and October 2017. Further, as described, circumstantial evidence indicates that Pointer helped manufacture the drugs for two of those deals at the Woodruff Apartment.

There is also evidence that Pointer and Garner had been involved in drug operations for a long time, including their prior convictions for drug offenses and the 2014 incident wherein Pointer's then-girlfriend accused Pointer of being involved in drug dealing and manufacturing. *Cf. United States v. White*, 874 F.3d 490, 498 (6th Cir. 2017) (noting while performing good faith exception analysis that the defendant's drug convictions "len[t] further credence to the informant's tip that defendant's narcotics activity was ongoing and that the controlled buy was not an aberration"); *United States v. Gilbert*, 952 F.3d 759, 764 (6th Cir. 2020) (noting while performing good faith exception analysis that the defendant's prior drug convictions were a factor in "establish[ing] '*some* connection' between the suspected drug trafficking and [the searched residence], in light of the marijuana taken from [the defendant's] trash at that address and his demonstrated history of drug trafficking").

---

[3] Pointer contends that *Reed* rendered *Ellison* and *Houser* outdated. However, the *Reed* Court cited both cases with approval. *See Reed*, 993 F.3d at 448.

Further, Pointer and Garner were observed to be involved in drug activity outside of the controlled buys. In May 2017, during a traffic stop, police found a large number of individually-wrapped crack rocks on Pointer's person. Police observed Pointer conducting apparent hand-to-hand drug deals on three separate occasions in June, August, and October 2017. This sort of evidence logically is, and has been viewed by courts as, evidence of drug dealing. *See, e.g.*, *United States v. Courtney*, 730 F. App'x 287, 291 (6th Cir. 2018) (emphasizing that "the officers themselves had seen [that] throughout the day [the defendant] typically let people into the apartment who stayed for only a few moments; outside the apartment, [the defendant] made a hand-to-hand exchange that looked like a drug sale; [and the defendant] drove his truck from the apartment to numerous houses where he made similar hand-to-hand exchanges. . ."); *United States v. Castro*, 364 F. App'x 229, 236 (6th Cir. 2010) (emphasizing the fact that an officer, "on several occasions, surveilled the residence and observed heavy traffic in and out of the residence for short periods of time, which in her experience and training suggested that narcotics deliveries were occurring"); *cf. United States v. Leake*, 998 F.2d 1359, 1364 (6th Cir. 1993) (citation omitted) (noting that "short visits" are "characteristic of drug trafficking"). Finally, officers observed Garner meeting with Pointer after receiving a large amount of cash in a parking lot in October 2017, despite not being gainfully employed.

While Pointer and Garner's operation may not have been on a national or international scale, "the *Reed* court," as Pointer concedes, "did not mark quantity as a critical factor in the analysis." Appellant's Br. at 24. Further, the evidence suggests that Pointer and Garner conducted multiple drug deals over the course of many months, occasionally manufacturing the drugs themselves—this is sufficient to create an inference of a substantial ongoing operation. *Cf. Reed*, 993 F.3d at 454 ("[The officer] could reasonably believe that the *ongoing* nature of [the

defendant's] drug dealing (as compared to the *quantity* of drugs sold) is what creates the fair probability that evidence would be located at his home.").

All this evidence points to the conclusion that Pointer and Garner were involved in a continuing drug operation, using the Woodruff Apartment as a base. This is more than enough for this Court to determine that there was a sufficient nexus between the Woodruff Apartment and drug activity such that the state magistrate had a substantial basis to conclude that there was probable cause for a search. We therefore affirm the district court and hold that the magistrate did not err in finding that there was probable cause to search the Woodruff Apartment.[4]

*c.) Staleness*

Pointer also alleges that certain information in the affidavit supporting the search warrant was stale. Probable cause cannot be supported by stale information. *United State v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998). But information is not stale merely because some time has passed since the relevant events occurred. Rather, this circuit looks to several factors in determining whether information concerning events relatively remote in time is too stale to support probable cause:

> (1) the character of the crime (chance encounter in the night or regenerating conspiracy?) (2) the criminal (nomadic or entrenched?) (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?) (4) the place to be searched (mere criminal forum of convenience or secure operational base?).

*Unites States v. Abboud*, 438 F.3d 554, 572–73 (6th Cir. 2006) (citation and internal quotation marks omitted). If the affidavit in question indicates continuous conduct, "time is of less significance." *United States v. Canan*, 48 F.3d 954, 959 (6th Cir. 1995) (citation omitted). Thus,

---

[4] Because we conclude that there was a substantial basis for the state magistrate to find probable cause to search the Woodruff Apartment, we decline to address the applicability of the good faith exception. *See United States v. Frechette*, 583 F.3d 374, 381 (6th Cir. 2009) ("There is no need to go into a lengthy analysis of whether the agents relied on the search warrant in good faith because the magistrate judge had a substantial basis for finding probable cause.").

while the drug trade typically concerns easily consumable and movable contraband, staleness concerns are lessened where there is "information indicating an ongoing and continuing narcotics operation." *Frechette*, 583 F.3d at 378 (quoting *United States v. Kennedy*, 427 F.3d 1136, 1142 (8th Cir. 2005)). A staleness argument is weak where "the crime at issue is ongoing or continuous and the place to be searched is a secure operational base for the crime." *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006).

Pointer argues specifically that (1) the controlled buys, which ranged from eight months to two months before the search was executed; (2) the discovery of drugs on Pointer's person seven months before; (3) the allegations against Pointer by his former girlfriend, which occurred three years before; and (4) Pointer's prior convictions, which were eight and twelve years old, are too stale to support a probable cause determination. Like the district court, we do not believe that these pieces of information are stale when the totality of the circumstances are considered, as they tell an overarching story of a continuous and ongoing drug operation based out of the Woodruff Apartment.

First, the controlled buys are not particularly remote—they all occurred less than a year before the search warrant was executed, with the latest occurring only two months beforehand. Second, all of the allegedly stale pieces of information were presented in the warrant in combination with the other evidence indicating that Pointer and Garner's drug operation was ongoing and continuous and that they used the Woodruff Apartment as a "secure operational base." *Hython*, 443 F.3d at 485. Evidence of the use of the Woodruff Apartment as a base and the ongoing nature of the drug operation includes Pointer and Garner's frequent use of the apartment, their meetings there immediately preceding controlled buys, the apparent hand-to-hand drug deals officers observed Pointer making, and Garner's receipt of a large amount of cash in a parking lot.

"Where recent information corroborates otherwise stale information, probable cause may be found." *United States v. Henson*, 848 F.2d 1374, 1381–82 (6th Cir. 1988) (citation omitted); *see also Spikes*, 158 F.3d at 924 ("[E]ven assuming the information in the affidavit was in some respects 'stale,' the more recent events related therein refreshed this otherwise stale information.").

The information here is far more extensive and indicative of an ongoing operation than the information deemed stale in *Hython*, which concerned only one drug sale with no information regarding when the sale took place. 443 F.3d at 486. And the controlled buys are more recent than the evidence in *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001), where the last alleged drug purchase at the searched location occurred 23 months before the warrant was executed, as (1) the drug activity at the location was frequent during that earlier period and (2) a package was sent from the location to a "known marijuana dealer" a few weeks earlier. Additionally, this Court in *Spikes* also found a warrant containing four-year-old information not stale, as the affidavit "provide[d] a continuing series of incidents involving either the manufacture, sale, or distribution of crack cocaine that are all connected in one form or another to [the searched residence]." 158 F.3d at 924.[5]

On the whole, Pointer's staleness argument fails. Even if some of the evidence cited by the warrant affidavit was remote in time, all of the evidence, considered together, paints a clear picture

---

[5] It is true, as Pointer points out, that in those cases drug sales occurred at the places to be searched. However, that fact is more relevant to the nexus argument than the staleness argument—the location of drug activity does not change its suggestiveness of an ongoing conspiracy, which is the key question in the staleness inquiry. And, as described in the nexus section above, there is plenty of evidence linking the Woodruff Apartment to drug activity, even if the controlled buys did not take place there.

of an ongoing drug operation using the Woodruff Apartment as a base.[6] This is sufficient to defeat an inference of staleness.

### d.) False Statements

In a final attack on the affidavit supporting the search warrant, Pointer argues that it contains false statements that should have been struck under *Franks v. Delaware*, 438 U.S. 154 (1978). This Court evaluates such a challenge under the same standard as for a denial of a suppression motion, reviewing factual findings for clear error and legal conclusions de novo. *United States v. Brown*, 732 F.3d 569, 574–75 (6th Cir. 2013). Under *Franks*,

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided. . . .

*Franks*, 438 U.S. at 155–56. An officer's negligent or accidental inclusion of false statements in an affidavit is insufficient to justify a *Franks* hearing or the striking of statements. *See, e.g.*, *United States v. Bateman*, 945 F.3d 997, 1008 (6th Cir. 2019).

Pointer appears to challenge only one statement on appeal: paragraph 25 of the affidavit, which reads "Affiant observed POINTER exit the door for apartment #2 located inside the apartment complex located at 3019 Woodruff." R. 41-1 at PID 341. He argues that

> This observation was physically impossible from where the Affiant was standing, which was outside the apartment building. Furthermore, in the hallway where the Defendant was allegedly observed exiting, there is not only a limited view, but also there are also [sic] two doors that Defendant could have been coming from.

---

[6] Even if the incidents farthest back in time (Garner and Pointer's arrests/convictions and the 2014 incident with Garner's then-girlfriend) were to be considered stale and excluded from the probable cause determination, probable cause would still exist based on the rest of the information in the affidavit.

Appellant's Br. at 28. While it is true that the affiant, Rochefort, admitted that he could not see the door to Apartment 2 from his vantage point, he also testified that

> when [Pointer] came into view, he was coming in. I could see him facing away as – like he would exit a door. He turns around, still has like a phone up to his ear and he's holding it with his shoulder, and I see he extends with his right arm and then makes a motion, brings it back, and has a bag in his left arm, and then he proceeds up – up the steps. . . . Everything from training, experience, and common sense told me that he exited apartment 2.

R. 41-3 at PID 425, 532. The district court concluded that "[b]ased on the photographs presented, Rochefort made a reasonable inference. Paragraph 25 is not knowingly false, nor does it exhibit a reckless disregard for the truth." R. 87 at PID 820. We agree. It was reasonable to infer that Pointer was exiting Apartment 2 based on what Rochefort saw in combination with the fact that Pointer consistently parked in the parking space assigned to that apartment and that he was seen with the leaseholder of the apartment. Further, as the government notes, Pointer does not allege that he was exiting from any other apartment in the building, making no showing that the statement that he exited from Apartment 2 was false. And Pointer does not provide any evidence of intent to lie or mislead. Pointer has therefore failed to demonstrate that the paragraph was false, or that even if it were false that the statement was intentionally or recklessly included.

In addition, Pointer has failed to demonstrate materiality, required under *Franks*. *See Franks*, 438 U.S. at 156. He argues that "[w]ithout these statements, there were insufficient facts in the affidavit to connect the Woodruff apartment building, and specifically its apartment two, to Mr. Pointer, Garner, or any alleged criminal activity. . . ." Appellant's Br. at 29. But this is simply untrue. Pointer and Garner were spotted near the apartment building several times, Pointer frequently parked in the spot assigned to the Woodruff Apartment, and Pointer was seen with the leaseholder of the apartment multiple times. This is sufficient for a finding of probable cause—

which is "not a high bar," *Bateman*, 945 F.3d at 1010—even absent the challenged statement. We therefore affirm the district court's denial of Pointer's *Franks* challenge.

**2. The November 7, 2019 Search of Pointer's Vehicle**

Pointer also challenges the district court's denial of his motion to suppress evidence seized from the November 7, 2019 search of his vehicle following a traffic stop, alleging that the search was unconstitutional.[7] As stated previously, in reviewing a district court's denial of a suppression motion, this Court applies a de novo standard to legal conclusions and a clear error standard to factual findings. Because there was probable cause to search the vehicle, we affirm the district court.

Under the automobile exception to the warrant requirement, officers may search a vehicle without a warrant "if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019) (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)). The subjective intentions of an officer in effecting a traffic stop are irrelevant. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). As long as there is probable cause to believe a traffic violation has been committed, an officer may initiate a traffic stop; and as long as there is probable cause to believe the vehicle contains evidence of a crime, the vehicle may be searched without a warrant. However, officers may not prolong a traffic stop unreasonably to generate probable cause for the search. *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020).

Pointer does not seem to argue that there was not probable cause to stop his car for a traffic violation; he instead focuses on the constitutionality of the search following the stop. Pointer

---

[7] Pointer also seems to argue that the search of his person during the stop was also unconstitutional. However, Pointer has pointed to no evidence obtained from that search that would be excluded under the exclusionary rule, and thus it is unnecessary to analyze that claim.

appears to use the wrong standard for this search in his briefs: he writes that "law enforcement lacked reasonable suspicion to believe that he was armed and dangerous" and that his "actions did not generate the requisite reasonable suspicion required for law enforcement to perform a search of his person and vehicle." Appellant's Br. at 34. This sounds similar to the standard for a *Terry* frisk. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968) (an officer may conduct a reasonable search for weapons "where he has reason to believe that he is dealing with an armed and dangerous individual" and he reasonably believes that "his safety or that of others [is] in danger"). However, the proper standard is whether there was probable cause to believe that the vehicle contained evidence of a crime.

Based on the evidence known to the officers as a collective at the time,[8] there was probable cause to believe that Pointer's car contained evidence of illegal drug activity. At the time of the search, the police were already aware of several facts linking Pointer to drug activity that have already been described, including the 2017 investigation into Pointer[9] (involving Pointer's participation in controlled buys, and the drugs found on his person during the 2017 traffic stop) and the four controlled drug buys Pointer participated in between July and September 2019. They also became aware of more facts supporting probable cause when effecting the stop, including (1) Pointer's erratic driving; (2) the sight of marijuana in the car and the smell of burnt marijuana emanating from the car, *see United States v. Brooks*, 987 F.3d 593, 599 (6th Cir. 2021) (officers have probable cause to search a vehicle when they "detect the odor of illegal marijuana coming

---

[8] Probable cause is determined by the collective knowledge of the police working together at the time of the search. *See United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014) ("[T]he collective knowledge of agents working as a team is to be considered together in determining probable cause." (quoting *United States v. Woods*, 544 F.2d 242, 259-60 (6th Cir. 1976))).

[9] The police department that stopped Pointer during the November 2019 traffic stop was aware of the 2017 investigation.

from the vehicle");[10] (3) the large wad of cash on Pointer's person, *see United States v. Real Prop. 10338 Marcy Rd. Nw., Canal Winchester, Ohio*, 938 F.3d 802, 810 (6th Cir. 2019) (citation omitted) ("Carrying large amounts of cash . . . may be 'strong evidence of some relationship with illegal drugs.'"); and (4) the positive indication from the drug-alert dog, *see United States v. Howard*, 621 F.3d 433, 447 (6th Cir. 2010) (positive indication from drug-alert dog can establish probable cause for the presence of drugs).

Altogether, all of the facts known to the officers at the time constituted a "fair probability" that Pointer's vehicle would contain evidence of a drug crime. *Reed*, 993 F.3d at 447. We therefore uphold the district court's denial of Pointer's motion to suppress the evidence found in the search of his vehicle.

### 3. Pointer's Sentence

Finally, Pointer challenges his sentence as procedurally and substantively unreasonable. This Court reviews criminal sentences for procedural and substantive reasonableness under an abuse of discretion standard. *United States v. Sears*, 32 F.4th 569, 573 (6th Cir. 2022). We review a district court's legal determinations concerning the Sentencing Guidelines de novo and the court's factual findings in that regard for clear error. *United States v. Bailey*, 931 F.3d 558, 562 (6th Cir. 2019). We address—and reject—Pointer's procedural and substantive arguments separately.

---

[10] While Michigan has legalized the possession of marijuana, it is still illegal under Michigan law to drive a vehicle after consuming the drug. *See* Mich. Comp. Laws § 257.625(8); *see also id.* § 333.27954(1)(a) (the Michigan Regulation and Taxation of Marihuana Act, which legalized marijuana in the state with limitations, does not authorize "operating, navigating, or being in physical control of any motor vehicle, aircraft, snowmobile, off-road recreational vehicle, or motorboat while under the influence of marihuana."). Thus, the smell of marijuana (and the sight of it in a vehicle) can still, logically, support probable cause to believe that a crime has been committed and that the vehicle contains evidence of that crime.

### a. Procedural Unreasonableness

Procedural unreasonableness in sentencing may arise from the district court improperly calculating the guidelines, treating the guidelines as mandatory, failing to properly consider the sentencing factors in 18 U.S.C. § 3553(a), considering impermissible factors, choosing a sentence due to clearly erroneous facts, or failing to sufficiently explain why the particular sentence was chosen. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).

Pointer alleges that his sentence was procedurally unreasonable because the district court, over his objection, applied the "drug-house" enhancement to his sentence. Under U.S.S.G. Section 2D1.1(b)(12), a defendant's offense level is increased two levels if "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." The enhancement "applies to anyone who (1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance," and the residence need only "play[] a significant part" in drug activity. *United States v. Johnson*, 737 F.3d 444, 447 & 449 (6th Cir. 2013).

There is sufficient evidence in the record to support applying the drug-house enhancement to Pointer. Pointer paid the Xfinity bill for the apartment, kept personal belongings there, parked in the apartment's parking space, had the key to the apartment, and received mail there, indicating that he maintained the premises even if he was not on the lease. And a large amount of cash, drugs, and drug-dealing/drug-manufacturing paraphernalia was found inside the Woodruff Apartment. *See Johnson*, 737 F.3d at 447–48 ("[T]he more characteristics of a business that are present in the home—such as tools of the trade . . . the more likely it is that the property is being used for the purpose of [prohibited] drug activities." (quoting *United States v. Verners*, 53 F.3d 291, 296–97 (10th Cir. 1995)) (quotation marks omitted)). There was little else in the apartment to signify that

it was used as anything other than a base for drug operations; the two bedrooms contained between them one mattress and some shoes and clothes in one closet, and there were few furnishings, food or dishes. The apartment was not Pointer or Garner's primary residence, and Pointer has not provided a specific reason for his use of the Woodruff Apartment. Further, there is circumstantial evidence, described above, that Pointer used the apartment to manufacture drugs for controlled buys in 2017. These facts support a drug-house enhancement. We therefore hold that the district court did not err in applying the enhancement.[11]

### b. Substantive Unreasonableness

A sentence is substantively unreasonable where its length fails to conform with the goal of § 3553(a) "to impose a sentence that is sufficient but not greater than necessary to serve the purposes of sentencing"—i.e., where the district court weighs the § 3553(a) factors incorrectly or fails to consider certain factors. *Sears*, 32 F.4th at 573. As stated above, we review the substantive reasonableness of a sentence under an abuse of discretion standard. *Id.* We may presume that a sentence that falls within the guidelines range is substantively reasonable. *United States v. Bailey*, 27 F.4th 1210, 1215 (6th Cir. 2022) (citation omitted).

Pointer's argument regarding substantive reasonableness is not very clear or developed. He appears to argue that the sentence was "far in excess of what would be necessary to serve the purposes of 18 U.S.C. § 3553(a)," and that the district court placed too much weight on his career

---

[11] Because we hold that the district court did not err, we need not analyze in full whether any error was harmless. However, any potential error was likely harmless, because, as Pointer concedes, the career offender enhancement applied by the district court automatically set his offense level at 37. Thus, his offense level would have been the same whether the drug-house enhancement had been applied or not. *See United States v. Castro*, 960 F.3d 857, 867 (6th Cir. 2020) ("[E]ven without the obstruction enhancement, [the defendant's] offense level would have been 43 (the maximum under the Sentencing Guidelines). . . . Accordingly, even if the district court erred in applying the enhancement, that error would not have affected [the defendant's] offense level or Guideline range and was therefore harmless.").

offender status, because Pointer's age (forty-seven) means he will "age out" of crime long before he is released. *See* Appellant's Br. at 38.

The district court in this case applied the career offender enhancement—which Pointer did not object to—bringing his offense level automatically to 37 and yielding a guidelines range of 360 months to life. The district court chose to sentence Pointer to 360 months, the bottom of his guidelines range. In doing so, the district court thoughtfully considered the § 3553(a) factors. The district court noted that the guidelines are advisory, and that it must impose a sentence "that's sufficient but not greater than necessary to comply with 3553(a)." R. 144 at PID 1849. The court discussed the substantial amount of drugs that Pointer was involved in and the harm he caused to his community; his continued participation in the drug trade, even after the earlier investigation of him turned up drugs; Pointer's stable upbringing, drug abuse, drug-related criminal history stretching back almost thirty years, and failure to remain gainfully employed; the length of sentences given to similar defendants; the possibility of educational and vocational training as well as substance abuse treatment; and Pointer's resistance to rehabilitation despite cycling through incarceration, parole, and probation. Finally, the district court noted and rejected Pointer's argument that he deserved a shorter sentence because he was likely to age out of crime, noting that he had been very difficult to deter for many years.

Based on this detailed discussion, it is hard to argue that the district court abused its discretion in weighing and applying the § 3553(a) factors. There may be, as Pointer points to, evidence suggesting that offenders age out of crime, and it may be that some policy factors support (and trends demonstrate) lower sentences for non-violent career offenders. But the district court was entitled to look at Pointer's specific history and circumstances and make a judgment call about Pointer's propensity to reoffend, the harm he caused to the community, and the danger he continues

to pose, even if he was not violent. *Cf. United States v. Miller*, 665 F.3d 114, 122 (5th Cir. 2011) (responding to the defendant's argument that "district courts in over 600 cases concluded that the advisory guideline range for child pornography offenses was greater than necessary to meet §3553(a)'s sentencing goals" by stating that "appellate courts are not tasked with applying statistical analyses to assess the reasonableness of a particular sentence in a particular case. Nor are district courts. While sentences imposed by other courts may be a consideration for a district court, such information does not set a median, floor, or ceiling"); *United States v. McKnight*, 807 F. App'x 421, 423 (6th Cir. 2020) ("[The defendant] also asserts that there is an 'overarching trend' of district courts imposing sentences below the guidelines range in child pornography cases. But 'the fact that a district court *may* disagree with a Guideline for policy reasons and *may* reject the Guidelines range because of that disagreement does not mean that the court *must* disagree with that Guideline or that it *must* reject the Guidelines range if it disagrees.'" (quoting *United States v. Brooks*, 628 F.3d 791, 800 (6th Cir. 2011))). Because Pointer has failed to make the necessary showing to rebut the presumption of reasonableness afforded his within-guidelines sentence, we hold that the district court did not abuse its discretion and that the sentence was not substantively unreasonable.

## V. CONCLUSION

In sum, we AFFIRM the judgment and the sentence of the district court in full.